DAVID V. PEÑA (6962)
Assistant Utah Attorney General
JOHN E. SWALLOW (5802)
Utah Attorney General
160 East 300 South, Sixth Floor
P.O. Box 140856
Salt Lake City, Utah 84114-0856
Telephone: (801) 366-0100
Email: Dpena@utah.gov

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| VIDA HAJIBEKLOU, Plaintiff, vs. STATE OF UTAH, UTAH DEPARTMENT OF TRANSPORTATION, Defendant. | MEMORANDUM DECISION AND ORDER GRANTING SUMMARY JUDGMENT IN FAVOR OF DEFENDANTS<br><br>Case No. 2:10CV00654 DN<br><br>Judge David Nuffer |
|---|---|

Plaintiff, Vida Hajibeklou, was employed by the Defendants, State of Utah and the Utah Department of Transportation ("UDOT"), from 1984 until her retirement in 2006. Plaintiff brought suit alleging claims of discrimination and harassment based on her gender, national origin and age. She also claims she was retaliated against after filing a charge of discrimination.

On January 31, 2012, Defendants filed a Motion for Summary Judgment and Supporting Memorandum (Docs. 22, 23). Plaintiff filed a memorandum in opposition on March 27, 2012 (Doc. 29). On April 25, 2012, Defendants filed a reply memorandum in support of their motion

(Doc 36). A hearing was held by the Court on March 29, 2013, at which time the parties stipulated to undisputed material facts and presented argument.

Having reviewed the submissions of the parties and heard oral arguments, the Court hereby finds and orders as follows.

## *UNDISPUTED MATERIAL FACTS*

1. Ms. Hajibeklou was hired on February 18, 1984, and worked in the Structures Division for the Utah Department of Transportation (UDOT) for twenty-three years.

2. Ms. Hajibeklou claims that throughout her employment she was subjected to negative and offensive comments and actions by some supervisors and coworkers of a sexist and racial nature.

3. Boyd Wheeler was Ms. Hajibeklou's supervisor from approximately 1996 to 2004. In 2004 he became her second level supervisor.

4. According to her testimony, "prior to 1989" she did not have "any issues with management, harassment, or any other issues."

5. Sometime "during the first few years of her employment," Plaintiff claims she "applied for many jobs, but her Human Resource Manager threw away her applications because [she was] not responding to his personal needs."

6. Also, "in the first few years" Plaintiff claims a coworker molded an eraser "in the shape of a male private part in a certain way and put it on the wall."

7. On another occasion, Plaintiff claims a co-worker named Chris Glazier placed a condom on her desk and said "this is for Kevin because he needs it on wedding night." Plaintiff

did not complain about this incident. Instead, she spoke to Risk Management who instructed her to tell him [Glazier] she would "turn him in," she did so and "he stopped."

8. At another point in time, Plaintiff claims she had issues with three co-workers: Phil Pool, Bob Nash and Boyd Wheeler.

9. Plaintiff claims Bob Nash "had a yelling problem." On one occasion, Plaintiff claims Mr. Nash yelled at her during a meeting about her not talking to another co-worker named Phil Pool.

10. Plaintiff claims Mr. Pool instigated that yelling incident because "of the plan he always had for humiliating woman." Plaintiff also claims Mr. Pool would take the first copy of anything she printed on the work printer and that on one occasion he told her, "Vida, if you were a bird, I would shoot you between the wings."

11. Plaintiff also claims Mr. Pool "brought a gun to work. That was before 9/11...I don't know whether he wanted to scare me or what, but he brought a handgun to work."

12. As for Mr. Nash, Plaintiff claims it was discriminatory that he gave a job to Larry Meppen because "Larry Meppen never had any experience in Structures, no experience in DigiMap, no experience. That's what I understood, ok?"

13. When hired in 2000, Mr. Meppen did have eighteen years of experience and some relevant computer aided design (CAD) experience. However, he did not have experience in the type of structural engineering (concrete or steel bridges, overpasses and culverts) that Ms. Hajibeklou and other employees of UDOT's Structures Division possessed.

14. In October of 1998, Ms. Hajibeklou passed the NICET Level IV Highway Design Exam.[1]

15. With respect to Mr. Wheeler, Plaintiff claims Mr. Wheeler told Hugh Boyle, her supervisor, "Do not let Vida learn more computer[.]... I wasn't allowed to learn new stuff [new CAD version] and that was their decision."

16. On July 11, 2000, Plaintiff claims she was "hit on the head with a metal bar by a co-worker named Duane Glad." During a remodeling of the office, Plaintiff asked Mr. Glad to help her install two end bars for the entrance of her cubicle. Plaintiff claims while she was bent down putting screws on the floor, Mr. Glad intentionally hit her on the head with one of the metal bars she had placed against the wall. However, Plaintiff testified there was no proof he hit her intentionally. Plaintiff testified she never saw what happened:

    Q. You said he picked up the pole and he–

    A. I think he did. I didn't see it [because I do not have eyes in the back of my head], but this is–you know, when I–when my head was down–

17. Ms. Hajibeklou testified that Mr. Glad didn't want women to work (outside of the home) and that at the time of the July 11, 2000 incident, Mr. Glad was tired and very angry. This incident caused Ms. Hajibeklou pain and suffering for many years.

18. When asked about specific incidents of discrimination based on gender, Plaintiff testified all the incidents referenced above are sexist in nature because "to me, the way they were–the threat to me that if you were a bird, I would shoot you between the wings or

---

[1] The acronym NICET stands for National Institute for Certification in Engineering Technologies. NICET administers exams and awards certain engineering certificates.

bringing a gun to work and the way they were after, you know–Phil Pool was always planning on doing something and then when the guy hit me on the head, these are all saying, 'I am [a] man. I am in control.'"

19. Ms. Hajibeklou testified that the male employees mentioned above seemed to act as if they thought they could get away with anything they did to her because she was a woman and from a different race and national origin (Iranian). She viewed these actions as showing the power of a man over a woman.

20. When asked specifically "what racial comments and racial slurs did you hear at the workplace," Plaintiff responded "action speaks louder than words."

21. When pressed for specifics, Plaintiff testified that sometime before 2000 Phil Pool was talking to someone and said "the reason why UDOT or in Structures we hire women is because we don't want them to go to Second South at night.... He didn't say that, but that's what he–he was talking about."

22. Other than that comment, Plaintiff's testimony with regard to racial discrimination was that she "was prevented from promotion, from transferring, from going anywhere, from getting out of that violent place."

23. Even though Ms. Hajibeklou asked to be transferred out of the Structures Division, UDOT never transferred her.

24. When asked about specific incidents of discrimination based on national origin, Plaintiff testified as follows:

I think it is a combination of being a woman and Iranian for the way Phil Pool, the way Duane Glad hit me, and this whole thing was a combination of

5

nationality or–I mean origin and being a woman from–it was combined. That's what I see.

25. However, when asked "Did any of them ever make comments directly about your national origin," Plaintiff testified "No, but–not directly."

26. Ms. Hajibeklou claims she was paid lower than similarly situated male employees because of her gender, race and national origin.

27. Sometime in 2001, Plaintiff raised to her supervisor, Boyd Wheeler, the issue of pay disparity:

    Q. So when did you first become aware that there was a pay disparity or that you believe there was a pay disparity?
    A. Actually–let's see, when I was talking to Boyd Wheeler, and I kept asking for–the thing is I was asking for transfer, I was asking to promotion and all these things. At that time, I went after finding out why, you know, you know my income is so low. And I had no idea what was going on. And Boyd Wheeler told me that you are paid–because you are paid less than everybody, that's why you are not—you don't make the money like [the] guys. That's what he told me[.]

28. In response, Plaintiff was given a chart with pay rate information for all technicians in the Structures Division from 1984 through 2001. According to the Pay Rate Chart, Plaintiff was indeed paid less than the other technicians in her division.

29. She was the lowest paid of all the level III technicians. Indeed, she was the lowest paid of all the technicians of any level in the Structures Division.

30. During her tenure she asked for an audit [regarding her pay rate] on several occasions.

31. On June 19, 2003, she sent an email to Bonnie Garcia with Human Resources stating in part:

    "I would like to know about filing a grievance. It is for the purpose of comparison why I am paid less than any one who started almost the same time as

I started working here in UDOT Structures.... I am doing Level 4 Tech job. I expect the same pay. I have been the victim in this system for almost 20 years."

32. In fact, when Plaintiff was first hired as a Draftsman, there were three other individuals occupying similar positions: Stephen Peterson, Phillip Pool and Terry Butcher. Mr. Peterson was hired by Defendants in 1967, while Mr. Pool and Ms. Butcher were hired in 1980.

33. When Ms. Hajibeklou was hired in 1984, none of the male employees were Level IV employees.

34. In response to Ms. Hajibeklou's inquiry, Bonnie Garcia sent Plaintiff a link for the policies and procedures to file a grievance, and set up a meeting on August 23, 2003 so Plaintiff could discuss all her concerns. At the meeting, Plaintiff "discussed everything: pay equity, harassment, my problem with head injury, and the effect it had. And–and I talked about everything." However, thereafter Plaintiff never filed a grievance.

35. Ms. Hajibeklou states she did not file a grievance because she was afraid she would suffer another injury if she did. She had also seen how management treated other employees (Steve Peterson, Saiid Jirsa) who had filed grievances and did not want to subject herself to such treatment.

36. Plaintiff was not a Level 4 Tech, but a Level III Tech. In her deposition she testified as follows:

Q. Let me ask you some questions about this email. First of all, you indicate you were doing a Level IV Tech job, but weren't, in fact, a Level IV tech, correct?

A. No.

> Q. Why did you expect the same pay as a Level IV tech when you were a–you were a Level III tech, correct?
>
> A. Yes.
> ...
>
> A. Because I was doing the work. I was doing Level IV work.
> ...
>
> And I thought since I'm doing Level IV, I should be paid, but in other district, if–they just–after passing NICET. they give them.

37. In her June 19, 2003 e-mail to Bonnie Garcia, she represented that she was doing Level IV work.

38. With regard to the NICET exam, Plaintiff had been notified two years earlier, in 2001, that:

    "[b]ecause you are in Highway Design you do not get a cross over for passing NICET.... There is only one crossover allowed per position and you received your cross over for NICET Level 3 in Construction when you were promoted to Design Technician III. This occurred on July 16, 1994."

39. Thereafter Plaintiff inquired about pay disparity again and received an email from Alan Lake dated June 23, 2003, wherein she was notified a study had been done "and you are paid equally."

40. That email states as follows:

    "Jerry Stone reviewed the historical salary and salary ranges of Ms. Beklou. Our records indicate that she has always been paid within the range of her designated position. As the salary range has changed, based on market comparison, she has been treated consistent with other similarly situated employees of the State."

41. According to the email when Plaintiff was hired in 1984, she was a Drafting Technician, grade 13, at step Level IV and was paid $6.14 per hour. In June 2003, Plaintiff's salary range was a step 37 through 60, which ranged from $12.37 to $23.09 per hour.

42. Plaintiff did not do any follow up after receiving that email. She claims she "couldn't do anything."

43. Then in February 2004, she showed up without an appointment to visit Mr. Lake.

44. During that meeting she "expressed frustration that she was low paid and had not been promoted.... She also stated that she felt her lack of opportunities and her lack of promotional opportunity was tied to her being a woman from Iran.... She made no specific mention or complaint of specific discrimination or legal action."

45. Thereafter in May 2004, Plaintiff sent an email to the Governor's Office wherein she claimed she was being "paid almost ½ of other Engineering Technicians who are doing the same work."

46. When asked during her deposition, "what other engineering technicians are you referring to in this email," Plaintiff responded, Phillip Pool, Farrell Bouck and Steve Peterson.

47. These three individuals were all Level IV Technicians, not Level III as was Ms. Hajibeklou.

48. In 2000, management hired Larry Meppen as a Level III technician at a higher pay level than it was then paying Ms. Hajibeklou. Ms. Hajibeklou also testified that management groomed Larry Meppen to advance to Level IV status.

49. In December 2003, Plaintiff inquired about applying to a Level IV technician position, but she only wanted to apply to the job if she was qualified.

50. Plaintiff believed that a T cube certificate and TET certificate "were the same thing." Plaintiff did not have a T cube certificate.

51. Mr. Lake explained to the Plaintiff:

    "the TET program has not been used as a minimum requirement for engineering technician jobs. If management would like to use this as a minimum requirement, they can always work with HR to determine if its fits.... I am sorry this does not align with your experience or education."

52. Plaintiff still believed she was qualified for the position. She testified:

    Q. "[S]o you were–you were informed that essentially you didn't have the qualifications because you didn't have T cube; is that accurate.

    A. That's what they say, but I was qualified because I wasted four years for that."

53. Plaintiff was unable to convince "management or anybody else that [her] TET would satisfy the T cube requirement."

54. In August 2005, Plaintiff sent another email to Mr. Lake wherein she claimed she had been passed over for a Level IV Technician position. Plaintiff stated "I have passed NICET Level IV in Highway Design, Level IV Construction and in house Level IV Structure. I deserve to...go to Level IV."

55. Ms. Hajibeklou was never promoted to a Level IV technician position.

56. In September 2005, her supervisor at the time, Jim McMinimee, responded to her inquiry and explained as follows:

    As you outlined in your email, it appears you have met some of the requirements for a Technician IV position. However, two of the critical requirements outlined

in this document that you did not identify you have successfully completed are, the recommendation from a division engineer for a Technician IV position and the peer review process. The peer review requirements are a key difference between a Technician III and Technician IV position. The Technician IV position requires an advance level of technical expertise and the ability to produce plans and simple projects independently. ...I have discussed the requirements for a Technician IV position with the management of the Structures Division. At this time, they do not believe you are performing at the advanced level required to fill a Technician IV position.

57. When asked about the two requirements she was missing–the peer review process and recommendation from an engineer–during her deposition, Plaintiff acknowledged that she never followed up or complained to anyone about these requirements. Her position was simply that the requirements were unfair: "I was working in a division that–it was male dominated and I just didn't want to be there."

58. Between August 2005 and August 2006, Plaintiff claims she applied for several positions which would have been promotions, but was not promoted because her supervisor "did not like foreigners" and "wanted to keep her in her place in the Structures Division." A summary of these positions, based on their position number, is as follows:

a. Engineering Technician IV, #2316: Ms. Hajibeklou withdrew her application and the recruitment was canceled.

b. Engineering Technician IV, #5454: Ms. Hajibeklou was not qualified and did not submit a resume with her application as required by UDOT policy. UDOT hired a Portuguese woman with eight years of related experience.

c. Engineering Technician IV, #7730: this position was cancelled as none of the applicants had certificates required for the position.

d. Engineering Technician IV, #7832: Plaintiff was interviewed for this position, but had difficulty answering the interview questions. UDOT hired a 41 year old white male with 20 years of experience. Plaintiff testified "he was" better qualified for the position than her.

e. Engineering Technician IV, #88 18: Plaintiff was interviewed for this position, but had difficulty answering the oral interview questions and [was] unable to complete the written part of the interview in the time allotted. Plaintiff acknowledged during her deposition she was unable to finish the written assignment. A 47 year old white male with 25 years of experience was hired.

f. Purchasing Coordinator, #89 19: Plaintiff was interviewed for this position but "she had difficulty with the practical part of the interview." Also, Plaintiff testified she had no experience as a purchasing coordinator and that the person hired was more qualified than her. A 41 year old white female with five years experience was hired.

g. Purchasing Agent, #9334: Plaintiff was interviewed for the position but had difficulty answering oral questions, as well as [received] a low score on the practical written test. Plaintiff testified she had no training or experience as a purchasing agent. A 44 year old white female was hired for the position.

59. In January 2006, Plaintiff sent an email to human resources alleging she was being forced to put up with her supervisor's "behavior from insult, harassment, intimidation, support of assault and emotional injury.... So what, I am a woman, Moslem, from the Middle East...and getting old."

60. Then in March 2006, Plaintiff was place[d] on a corrective action plan ("CAP") for poor performance.

61. Plaintiff claims the CAP was in retaliation for her earlier complaints of discrimination and harassment.

62. The CAP did not affect Plaintiff's duties, pay or benefits.

63. However, Plaintiff claims that during the CAP she was subjected to intimidation and verbal abuse by her supervisor–that he was "putting her through hell."

64. In June 2006, Plaintiff was informed by her supervisor she had not successfully completed the CAP and he was going to discipline her.

65. Ms. Hajibeklou did not file a grievance because she was afraid that she might get hurt again.

66. At that meeting Plaintiff became belligerent and yelled at her supervisor:

    A. He–he talked too loud. And I talked too loud, too.... And I know that wasn't right. But I couldn't help it because I was under a lot of stress.

67. Plaintiff also threatened her supervisor and as a result was suspended for one-day.

68. In October 2006, Plaintiff informed UDOT she planned to retire at the end of the year. Plaintiff's last day of work was December 29, 2006.

69. When asked about her reason for retiring, Plaintiff testified she had retired due to the incident with the metal bar in 2000. Specifically, Plaintiff testified as follows:

    Q. How did this event that happened back [i]n July of 2000 lead you to feel like you had to retire in December 2006?

    A. I kept having anxiety attack after that. And the chest pain and anxiety attack and pain was severe. And MRI done, the–my doctor put me on Ultram, which is pain killer. But anxiety attack for six years never left me. And then when there was those fighting and argumenting[sic], the environment between Saud Jirsa and Boyd Wheeler and all those guys. These guys were always yelling and screaming at each other and it was very tense[.]

70. Plaintiff also testified the corrective action plan of March 2006 was another reason she thought she had to retire, as well as her fear of losing her retirement:

    A. Because I have worked so long so–so hard. I didn't want to lose my retirement, because four corrective action, you're out. That's what I understood.

    Q. You wouldn't lose your retirement, however. You are vested in your retirement.

    A. If they–if they fire you, you lose it.

    Q. So you feared losing your retirement–

13

> A. Uh-huh (Affirmative).
>
> Q. Because of the CAP–
>
> A. Yes.

71. When asked specifically if her supervisor had ever told her "he was going to make a file of corrective action [to] force you to retire," Plaintiff testified, "He didn't say, I will make you retire. But he said [will put you on corrective action plan."

72. Plaintiff claims her voluntary retirement constituted constructive discharge.

73. On August 7, 2006, Plaintiff filed a Charge of Discrimination ("Charge") with the Utah Anti-Discrimination and Labor Division.

74. In her charge Plaintiff alleges that she was subject to "racial slurs, intimidation and sexist and negative comments about my gender."

75. Plaintiff also alleged that on January 23, 2006, she complained to her manager about discrimination and was retaliated against for this act by being place[d] in "Coaching." She further alleges that her coaching "consisted of berating, intimidation and verbal abuse and disciplinary action notice placed in my personel [sic] file."

76. Finally, Plaintiff alleged in her Charge that she was denied promotions and transfer opportunities.

77. The UALD determined that there was not reasonable cause to conclude that UDOT had discriminated or retaliated against Ms. Hajibeklou.

## CONCLUSIONS OF LAW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A mere scintilla of evidence will not suffice to allow a nonmoving party to survive summary judgment." Smith v. Rail Link, Inc., 697 F.3d 1304, 1309 n. 2 (10th Cir. 2012). When a moving party does not bear the burden of proof at trial, the moving party may discharge its burden of supporting its motion with affidavits or other materials by showing that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

Defendants moved for summary judgment on each of Plaintiff's various causes of action on the grounds that Plaintiff's claims are legally barred or cannot be sustained because, even if viewed in a light most favorable to Plaintiff, the facts are not sufficient to support Plaintiff's claims.

### *First Claim for Relief*

Plaintiff sought relief under the Utah Antidiscrimination Act ("UADA"). U.C.A. § 34a-5-101 et seq. As Plaintiff acknowledged in her response to Defendants' Motion for Summary Judgment and during oral argument, pursuant to the language of the UADA, parties may only attempt to enforce the UADA in state agencies and state courts. U.C.A. § 34a-5-107(15) & (16). Accordingly, Plaintiff's claims brought pursuant to the UADA are dismissed.

### Second Claim for Relief

Plaintiff alleged discrimination based on her age and in violation of the Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq. ("ADEA"). However, as Plaintiff acknowledged during briefing and oral argument, the State and its agencies, such as UDOT, have Eleventh Amendment immunity from such claims. *Kimel v. Florida Bd. Of Regents*, 528 U.S. 62 (2000). Therefore, Plaintiff's ADEA claim is dismissed.

### Third Claim for Relief

Plaintiff alleges that based on her gender and national origin she was harassed and also discriminated against in her pay and denial of promotions in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16(c). Specifically, Plaintiff alleges she was subject to unwelcome conduct and comments based on her gender and national origin, was paid less than similarly situated males, and was denied promotions.

In her pleadings and during oral argument, Plaintiff conceded that the facts were insufficient to support her failure to promote claim and the claim is dismissed. As for Plaintiff's pay claim, the Court finds that Plaintiff failed to exhaust her administrative remedies and the Court may not exercise jurisdiction over the claim. In *Martinez v. Potter*, 347 F.3d 1208 (10th Cir. 2003), the Tenth Circuit Court ruled that claims not raised at the administrative level may not be advanced to this Court. Plaintiff's pay claim is dismissed.

On Plaintiff's claims of a hostile work environment, the Court finds that even if viewed in a light most favorable to Plaintiff, the undisputed facts are insufficient to support a charge of unlawful harassment. To prevail on a claim of hostile work environment, a plaintiff must be

able to demonstrate that her workplace was permeated with discriminatory comments or conduct so severe they altered the terms and conditions of employment. *MacKenzie v. Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005). In addition, when reviewing allegations of harassment, courts are to "filter out offhand comments, and isolated incidents (unless extremely serious)." *Id.*

In Ms. Hajibeklou's case, the small number of alleged offensive comments and unwelcome conduct (some of which do not appear to be directed at Ms. Hajibeklou due to her membership in any protected class and, thus, are not discriminatory) occurring over the span of Plaintiff's long career at UDOT, are insufficient to establish that any terms and conditions of Ms. Hajibeklou's employment were unlawfully altered. (Compare with *Hasco Corp. v. Renner*, 475 F.3d 1179, 1188 (10th Cir. 2007)(finding for Plaintiff when facts showed an "environment polluted with gender-specific comments and behavior.")). Plaintiff's claims of unlawful harassment and discrimination are dismissed.

## *Fourth Claim for Relief*

Plaintiff alleges Defendants retaliated against her after she filed a charge of discrimination with the Utah Labor Commission. Plaintiff alleged in her charge of discrimination that after she complained to her employer of unlawful discrimination she was placed in "coaching." In her complaint filed with this Court Plaintiff further alleged that she was placed on a corrective action plan, suspended for one day, and eventually constructively discharged.

As to the "coaching," Plaintiff admits that her employer placed her in "coaching" prior to the time Plaintiff alleges she engaged in protected activity. Thus, the "coaching" could not have

been an act of retaliation for Plaintiff having engaged in protected activity. In addition, being placed in "coaching," is not the kind of adverse job action which rises to the level of being considered unlawful retaliation.

Regarding Plaintiff's allegations that she was place on a corrective action plan, suspended and constructively discharged in retaliation for her having complained of unlawful discriminatory conduct, Plaintiff failed to amend her charge of discrimination to include these claims. Each is a discreet act of alleged discrimination and Plaintiff is required to exhaust her administrative remedies as to both. *Martinez,* 347 F.3d at 1210. Plaintiff has failed to do so and her claims must be dismissed.

## CONCLUSION AND ORDER

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment is GRANTED.[2] The clerk of this Court is directed to close the case.

August 1, 2013.

BY THE COURT:

s/ David Nuffer

_____
David Nuffer
United States District Judge

---

[2] Docket no. 22, filed January 31, 2012